

FILED

MAY 18 2017

CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

CALEB GIDDINGS,                    )        C IV 17-4068
                                   )
            Plaintiff,             )
                                   )
VS.                                )        **COMPLAINT**
                                   )        (Jury Trial Demanded)
MEDIA LODGE, INC.,  IA TECH, LLC., )
ADAMS KEEGAN, INC. d/b/a ADAMS     )
KEEGAN – GA, INC. d/b/a ADAMS      )
KEEGAN – GA, LLC, and JEFF SIEGEL, )
                                   )
            Defendant.             )
                                   )

COMES NOW Caleb Giddings, and for his Complaint against Defendant Media Lodge, Inc.,  IA Tech LLC, Adams Keegan, Inc. d/b/a Adams Keegan – GA, Inc. d/b/a Adams Keegan and Jeff Siegel, states and alleges as follows:

### JURISDICTION, VENUE AND PARTIES

1) This civil action is brought under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301, et seq. ("USERRA").

2) During the relevant times of this Complaint, Plaintiff ("Giddings") is an adult resident of Minnehaha County, South Dakota.

3) Defendant Media Lodge, Inc. ("Media Lodge"), at all times relevant to this action, is and has been an  electronic media marketing company directed at "outdoor enthusiasts" with interests in hunting, shooting, sports camping, fishing, motorsport and other outdoor activities.  Media Lodge is incorporated in Delaware, has a location in the state of Georgia, but also operates in Connecticut under the supervision of Jeff Siegel.

4) At all times relevant to the Complaint, Media Lodge maintained a place of business located at 230 South Phillips Ave, Suite 307 in Sioux Falls, South Dakota 57104.

5) Defendant IA Tech, LLC ("IA Tech"), at all times relevant to this action, is a strategic advisory firm that owns and partners with electronic media marketing companies directed at "outdoor enthusiasts" with interests in hunting, shooting, sports camping, fishing, motorsport and other outdoor activities.

6) Upon information and belief, IA Tech is the majority owner of Media Lodge, Inc.

7) Upon information and belief, IA Tech retains the authority to hire and fire employees, dictate work rules including the employment handbook policies and procedures, and to set the conditions of employment for employees who work at Media Lodge.

8) Upon information and belief, Defendant Adams Keegan, Inc. is a Tennessee corporation doing business as ("d/b/a") Adams Keegan - GA, Inc. d/b/a Adams Keegan – GA, LLC ("Adams Keegan"). At all times relevant to this action, Adams Keegan was a national human resources and professional employer organization ("PEO") that works with businesses to provide human resources management services, including hiring and retention services. Upon information and belief, all Media Lodge employees were employed through Adams Keegan, including those working at its Sioux Falls, South Dakota location.

9) Upon information and belief, Adams Keegan contracted to provide employees through a lease agreement to Media Lodge, including but not limited to, providing payroll and human resources services.

10) Defendant Jeffrey Siegel is the CEO of Media Lodge, and an agent of Media Lodge. Upon information and belief, Mr. Siegel resides in the state of Connecticut.

11) IA Tech is incorporated in Delaware and has its principal place of business in the Atlanta, Georgia area. At all times relevant to the Complaint, and upon information and belief, IA Tech was jointly operating Media Lodge in Sioux Falls, South Dakota.

12) Media Lodge's press releases state that "Media Lodge is a division of IA Tech, which is also the parent company of GunBroker.com." Media Lodge's liabilities include monies "Due to IA Tech LLC" which are "to fund operations in the event of a shortfall in capital" at Media Lodge.

13) Media Lodge, IA Tech, LLC, and Adams Keegan are each a "private employer" as defined in 38 U.S.C. § 4303(4)(A)(i).

14) This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. § 1332 because the amount in controversy in this matter exceeds the sum of $75,000, exclusive of interests and costs, and is between citizens of different states. This Court also has jurisdiction pursuant to 38 U.S.C. § 4323(b) because this civil action involves a federal question.

15) Venue is proper in this judicial district under 38 U.S.C. § 4323(c)(2) because at all relevant times the private employer maintained a place of business in this jurisdiction, and pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to this action occurred in this judicial district.

## GENERAL ALLEGATIONS

16) Giddings has been a member of the United States Air Force Reserves since October 2014. At the time of the allegations of this lawsuit, Giddings' rank was Airman 1st Class. Giddings' current rank is Senior Airman. On or about September 29, 2015, Giddings was

awarded the Sergeant Louis H. Fischer Award, for being in the top 1 percent of academic and military performance in his class.

17) As part of a March 31, 2015 merger between Media Lodge and an entity called GunUp Publishing, Inc., an internet media and marketing company catering to firearm enthusiasts, manufacturers and retailers, Giddings was hired by Defendants to serve as Media Lodge's Director of Sales.

18) In his capacity as Director of Sales, Giddings' job responsibilities included sales of advertising to be placed on Media Lodge's network of websites. Giddings' compensation included a base salary of $70,000 per year and an additional 30 percent commission opportunity based upon closing of advertiser sales accounts, for a total compensation of $91,000 per year.

19) Prior to the closing of the merger, Giddings informed Media Lodge of his upcoming mandatory active duty at the Air Force Basic Military Training and Air Force Technical School and his intent to return to Media Lodge following completion of his military service.

20) Giddings had made clear to Media Lodge before leaving for his active duty military duty his desire and intent to return to work at Media Lodge after completing his military service.

21) From on or about April 21, 2015 until on or about September 30, 2015, Giddings was activated for mandatory active duty at the Air Force Basic Military Training and Air Force Technical School.

22) Before going on active duty, Giddings transitioned his sales accounts to two other Media Lodge Sales Directors, Lee Sarles and Christen Everly. Giddings provided Sarles and Everly with the contact information for each of the sales accounts. Giddings transitioned the sales accounts to Sarles and Everly via email, as well as during an in-person meeting at the

National Rifle Association Annual Meeting April 10 through 12, 2015. This transition plan had been briefed to and was approved by Media Lodge's CEO, Jeff Siegel.

23) Upon information and belief, the majority of Giddings' sales accounts were transitioned to Sarles.

24) Upon information and belief, Sarles did not follow up on the Giddings' sales accounts that were transitioned to him.

25) Upon information and belief, Sarles remained employed by Media Lodge until approximately November 2016.

26) On or about the weekend of July 4, 2015, while Giddings was on active duty, Daniel Hall, Media Lodge's Vice President of Business Development and Publisher of "GunUp the Magazine" called Giddings to discuss Giddings' return to work date.  During their phone call, Hall informed Giddings that Siegel had expressed concerns about Giddings' dedication and loyalty to Media Lodge because Giddings had left Media Lodge for active military duty.

27) During the phone call with Mr. Hall, Giddings confirmed his loyalty and intent to return to work at Media Lodge after his active duty tour but could not provide an accurate return to work date.

28) On or around September 10, 2015, while Giddings was still on active duty, Hall called Giddings again and informed Giddings that Siegel had again expressed doubt regarding Giddings' dedication and loyalty to Media Lodge because of Giddings' alleged failure to proactively keep in touch with Media Lodge while on active duty and because Giddings had not yet confirmed his return to work date.

29) Under USERRA, and pursuant to Defendants' own military leave policy, Defendants knew or should have known that while Giddings was on active duty, Giddings had no duty to maintain contact with Media Lodge or to confirm his return to work date.

30) On September 13, 2015, in response to Siegel's concerns, Giddings sent an email requesting instructions to set up his Media Lodge email on his phone so that he could "have access to that email prior to my return," and informed Media Lodge that he would be returning to work on October 12, 2015, which was approximately one week after Giddings' active duty tour ended.

31) In the September 13, 2015 email, Giddings also informed Media Lodge that he was "subject to follow-on orders when I return [to Media Lodge], at the needs of the Air Force. What that mean is that I could get placed back on active duty for up to 90 days once I get back. However, that is very unlikely …."

32) On September 25, 2015, Giddings had a telephone call with Siegel while still on active duty at Lackland Air Force Base in Texas. During this telephone call, Siegel asked Giddings whether he would be returning to work for Media Lodge after completing his active duty military service. Siegel also questioned Giddings' loyalty to Media Lodge, stating that Giddings' military service caused him to question whether Giddings was committed to Media Lodge.

33) At no time did Giddings suggest or tell Media Lodge that he was not going to return to work as Director of Sales following his active duty military service.

34) On or about October 4, 2015, Giddings returned to Sioux Falls, South Dakota following completion of his active duty military service.

35) On October 5, 2015, before Giddings' official return-to-work date, Giddings had a phone call with Defendants' employee Christen Everly in which she expressed disappointment that Giddings' sales accounts had not converted to Media Lodge contracts while he was on military duty. She also expressed displeasure with his taking a week off after his military duty ended.

36) Everly was promoted to Vice President of Sales, reporting to Siegel, in or around October 2015. With that promotion, Everly became Giddings' supervisor.

37) On or about October 12, 2015, Giddings returned to work for Defendants. Upon his return, Giddings was not assigned the high-performing sales accounts he had prior to his military leave, but rather was given sales accounts with a poor likelihood of yielding commissions. The accounts Giddings had been assigned to before he left for military duty, with which he had built long term personal and professional relationships with during his tenure in the firearms and shooting sports industry, had been given to other Sales Directors.

38) Upon information and belief, in determining what sales accounts to assign Giddings upon his return from military leave, Defendants did not perform any analysis of the sales accounts that Giddings would have been assigned but for his military service.

39) On or about October 15, 2015, Giddings had a telephone call with Siegel in which Giddings discussed with Siegel his concern that all of his high-performing sales accounts from prior to his military leave had been assigned to other sales employees. Giddings expressed concern that his new sales account assignments were poor and unlikely to yield commissions. Siegel responded by telling Giddings that he would have to "hustle" and "work the floor" at the next major industry conference, the National Association of Sporting Good Wholesalers

Expo from October 27 to October 30, 2015 in New Orleans, LA. in order to prove his

loyalty and performance capability.

40) On or about October 19, 2015, Plaintiff spoke with Everly about his account assignments.

During the call, Everly again commented on the fact that Giddings' sales accounts had not

performed [i.e., closed] during his military leave.

41) On or about December 8, 2015, Siegel had a telephone conversation with Giddings and told

Giddings' that he did not think Giddings' "heart was in" his position as Sales Director with

Media Lodge and that he did not believe Giddings' loyalty had ever been to Media Lodge

because of his military service.  He also complained that Giddings' sales accounts had not

performed while Gidding was on military leave.  He told Giddings that he would either have

to take a demotion to a contract position in which he would earn approximately $2,000 a

month or be "transitioned" out of the company.

42) The Defendants knew or should have known that Giddings would not be able to afford to

accept a demotion to a contract position that paid $2000 a month.

43) On December 16, 2015, Giddings had his final verbal conversation with Siegel as a Media

Lodge employee.  During that phone call, Siegel again expressed that he did not believe that

Giddings' loyalty had never been to Media Lodge and that he believed that Giddings had

prioritized his military career over the company.  Siegel suggested that Giddings move on

and that the parties go their separate ways.

44) On December 17, 2015, Giddings was discharged from employment as Director of Sales.

45) Upon information and belief, Defendants were involved in the decisions to take the

following adverse actions against Plaintiff, including but not limited to:  the unjustified

removal of Plaintiff's strong sales accounts and giving him lower performing ones upon his

return to Media Lodge in violation of USERRA's escalator principle, termination of his

employment with Media Lodge as Director of Sales without just cause, and demotion to the

contract position without just cause.

46) Giddings has subsequently obtained replacement employment earning significantly less than

the $91,000 total compensation he was earning at Media Lodge.

47) Upon information and belief, Defendants hired David Grant as Director of Sales in January

2016 to replace Plaintiff.   Upon information and belief, Mr. Grant is a civilian, and is not a

member of any branch of the United States military or a veteran.

48) Plaintiff was on active military duty from on or about March 3, 2017 until April 20, 2017.

He is aware that Mr. Hall's lawsuit against Media Lodge, et al has been resolved but has no

other knowledge regarding that resolution.

## CAUSES OF ACTION

## CLAIM I:  FAILURE TO PROPERLY RE-EMPLOY PURSUANT TO USERRA

49) The Defendants, including Mr. Siegel personally, had a duty to provide reemployment

rights and benefits and other employment benefits to Giddings because Giddings' absence

from his position of employment was necessitated by reason of service in the uniformed

services.

50) Giddings satisfied USERRA's notice, service length, and reemployment request

requirements by providing advance written or verbal notice of his service to his employer,

the length of his military absence from employment did not exceed five years, and by timely

requesting reemployment from his employer.

51) Upon completion of a period of service in the uniformed services, the Defendants had a

duty to promptly reemploy Giddings in the position of employment in which Giddings

would have been employed if his employment had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the Giddings was qualified to perform.

52) Defendants failed to reemploy Plaintiff in a position which he would have been employed if his employment had not been interrupted by his military service, including assignment of the sales accounts that he would have had but for his military service.

53) Defendants did not experience a change in circumstances or an undue hardship that would have required the assignment of lesser sales accounts to Giddings.

54) Defendants had a duty under USERRA to perform an analysis to consider Giddings' pre-activation sales accounts to determine the appropriate post-service reemployment position and sales account assignment. Defendants failed to comply with that duty.

55) Defendants' violations of USERRA Section 4313 were willful under 38 U.S.C. § 4323(d)(l)(C).

56) Giddings has suffered a substantial loss of earnings and other benefits in an amount to be proven at trial as a result of Defendants' violations of USERRA.

## CLAIM II:  DEMOTION IN VIOLATION OF USERRA

57) The Defendants, including Mr. Siegel individually, were prohibited from denying Giddings retention in employment, promotion, or any benefit of employment in relation to Giddings' active duty service.

58) The Defendants discriminatorily demoted Giddings from his Director of Sales position, terminating his employment from that position and offering him the "Hobson's choice" of either taking a contract (non-employee) position with substantially less pay and benefits than his prior position, or being "transitioned" out of Media Lodge entirely because of a

stereotype or perception that Giddings was not "loyal" or "dedicated" to his employer

because of his membership in the United States Air Force Reserves, his absence from work

to perform active military service, and/or his military service obligations.

59) The Defendants demoted Giddings from his Director of Sales position by requiring him to

accept a lower paying contract (non-employee) position with lesser responsibilities and

benefits because of a stereotype or perception that Giddings was not "loyal" or "dedicated"

to the employer because of his membership in the United States Air Force Reserves, his

absence from work to perform active military service, and/or his military service obligations.

60) Defendants did not experience a change in circumstances or an undue hardship that would

have required demotion of Giddings from his Director of Sales position where Defendants

replaced Giddings with non-Veteran civilian David Grant in January 2016.

61) Defendants violated USERRA by demoting Plaintiff from his Director of Sales position.

62) Defendants' violations of USERRA Section 4313 were willful under 38 U.S.C. §

4323(d)(l)(C).

63) Giddings has suffered a substantial loss of earnings and other benefits in an amount to be

proven at trial as a result of Defendants' violations of USERRA.

## CLAIM III: TERMINATION IN VIOLATION OF USERRA

64) Defendants, including Mr. Siegel individually had a duty not to discharge Giddings from

employment within 180 days after his date of reemployment after Giddings' active duty

service without just cause.

65) On or about December 8, 2015, the Defendants advised Giddings that he had to accept a

demotion to a contract (non-employee) position with substantially less pay and benefits, or

be terminated.

66) On or about December 16, 2015, the Defendants told Giddings that it would be in Giddings' best interest if Giddings left his employment with Defendants entirely.

67) Defendants did not experience a change in circumstances or an undue hardship that would have required the elimination of Giddings' Director of Sales position where Defendants replaced Giddings with non-Veteran civilian David Grant in January 2016.

68) By engaging in the conduct described herein, Defendants terminated Giddings' employment without just cause in violation of USERRA.

69) Defendants terminated Giddings from his Director of Sales position because of a stereotype or perception that Giddings was not "loyal" or "dedicated" to his employer because of his membership in the United States Air Force Reserves, his absence from work to perform active military service, and/or his military service obligations.

70) Defendants violated USERRA by terminating Plaintiff from his Director of Sales position.

71) Defendants' violations of USERRA Section 4313 were willful under 38 U.S.C. § 4323(d)(l)(C).

72) Giddings has suffered a substantial loss of earnings and other benefits in an amount to be proven at trial as a result of Defendants' violations of USERRA.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Caleb Giddings respectfully requests that the Court grant him the following relief:

1)   For a trial by jury on the merits of his claims;

1)   For compensatory damages to make Giddings whole by providing appropriate compensation for back pay, benefits and front pay he has lost as a result of the Defendants' unlawful employment practices, in amounts be determined by the jury;

2)   For general damages to make Giddings whole by providing appropriate compensation for the distress, anxiety, humiliation and inconvenience he has suffered as a result of the Defendant's unlawful employment practices, in amounts to be determined by the jury;

3)   For liquidated damages in amounts to be determined by the jury pursuant to 38 U.S.C. § 4323(d); and

4)   For his costs and disbursements incurred, including reasonable attorney fees, and for such other and further relief as the Court may deem just as allowed by to 38 U.S.C. § 4323(h).

**JURY DEMAND**

Plaintiff hereby demands a jury trial under Federal Rule of Civil Procedure 38.


Dated this ____ day of May, 2017.


JOHNSON POCHOP & BARTLING

Stephanie Pochop
405 Main Street | PO Box 149
Gregory, SD 57533
(605) 835-8391
stephanie@rosebudlaw.com
*Attorney for Plaintiff Caleb Giddings*