UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CALEB GIDDINGS,<br><br>Plaintiff,<br><br>vs.<br><br>MEDIA LODGE, INC., IA TECH, LLC,<br>ADAMS KEEGAN, INC., ADAMS KEEGAN-<br>GA, LLC, and JEFF SIEGEL,<br><br>Defendants. | 4:17-CV-04068-RAL<br><br><br>OPINION AND ORDER GRANTING<br>MOTION TO STAY CASE AND COMPEL<br>ARBITRATION |

Plaintiff Caleb Giddings, a Senior Airman in the United States Air Force Reserves, worked for GunUp Publishing, Inc. (GunUp) in South Dakota. When GunUp merged with Media Lodge, Inc. (Media Lodge) in the spring of 2015, Giddings accepted a job as Media Lodge's director of sales. Shortly thereafter, Giddings left to serve active duty for five-plus months with the Air Force. After returning from active duty, Giddings allegedly was demoted by and then terminated from Media Lodge without cause. Giddings sued Media Lodge, Media Lodge's Chief Executive Officer (CEO) Jeff Siegel, and Media Lodge's majority owner IA Tech, LLC (IA Tech) (collectively "Defendants")[1], alleging that they violated the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). Doc. 41. Defendants filed a motion arguing that the Federal Arbitration Act (FAA) and the arbitration clause in

---

[1]Giddings also named Adams Keegan, Inc. and Adams Keegan-GA, LLC as defendants in his lawsuit. This Court will be issuing a separate opinion addressing the motion to dismiss by the Adams Keegan defendants. Giddings had no agreement to arbitrate with the Adams Keegan defendants, and the Adams Keegan defendants have filed no motion to compel arbitration.

1

Giddings' Employment Agreement require this Court to stay or dismiss Giddings' case and compel arbitration. Doc. 18. For the reasons explained below, this Court grants Defendants' motion to compel arbitration under the arbitration clause, but stays the case rather than dismissing it.

## I. Facts

GunUp was an internet media and marketing company that catered to firearms enthusiasts, manufacturers, and retailers. Doc. 24 at ¶ 5. Giddings and his then-wife Shelley (Shelley) worked for GunUp in South Dakota, and Giddings was a minority share owner of GunUp. Doc. 24 at ¶¶ 5–7. Media Lodge is an electronic media marketing company, has employees in several states, and sells electronic advertising services throughout the country. Doc. 21 at ¶ 3. Media Lodge's content targets outdoor enthusiasts who are interested in hunting, shooting, fishing, and other outdoor activities. Doc. 21 at ¶ 3.

In 2014, Media Lodge CEO Siegel and Daniel Hall, GunUp's CEO, began negotiating a merger between GunUp and Media Lodge. Doc. 25-1 at 4; Doc. 29. These negotiations included discussions about Hall, Giddings, and Shelley coming to work for Media Lodge. Doc. 25-1 at 4; Docs. 29–29-7. GunUp and Media Lodge executed a merger agreement on March 31, 2015. Doc. 41 at ¶ 17; Doc. 25-5 at 18. The next day, Giddings, Shelley, and Hall signed employment agreements with Media Lodge. Doc. 21 at ¶ 5–7; Doc. 21-1; Doc. 24 at ¶ 6; Doc. 25-1 at 4–5. Giddings's Employment Agreement contained the following arbitration clause:

> *Binding Arbitration.* In the event any disagreement arises under this Agreement, the disagreement shall be settled by binding arbitration pursuant to the Rules of the American Arbitration Association. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1–16, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The place of arbitration shall be Atlanta, Georgia, there shall only be one arbitrator selected by the

parties, and the arbitrator shall not be empowered to award damages in excess of actual damages, although the arbitrator shall be empowered to award injunctive relief. The parties hereto hereby waive all defenses in connection to any arbitration hereunder or the enforcement of any arbitration award rendered pursuant hereto.

Doc. 21-1 at 6.

Giddings went on mandatory active duty with the United States Air Force from late April 2015 until September 30, 2015. Doc. 41 at ¶ 21. Giddings alleges that when he returned to work upon completing his service, Media Lodge violated USERRA by failing to properly reemploy him, demoting him without just cause, and terminating him without just cause. Doc. 41 at ¶¶ 49–75. Giddings seeks compensatory, general, and liquidated damages from Defendants for these alleged USERRA violations. Doc. 41. Since filing his suit, Giddings has relocated to Florida. Doc. 41 at ¶ 2. This Court held a hearing on the motions in this case in late 2017.

## II.     The FAA and Standard of Review

Congress enacted the FAA to counter judicial aversion to arbitration and ensure that courts treat arbitration agreements just like any other contract. Volt Info. Scis., Inc. v. Bd. of Trs. Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989). The key language of the FAA states that a written agreement to arbitrate in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA applies here because the Employment Agreement, including the arbitration clause, is in writing and because the Agreement concerned Giddings's work with Media Lodge, a company that is engaged in interstate commerce. Doc. 21 at ¶ 3; CarMax Auto Superstores Cal. LLC v. Hernandez, 94 F. Supp. 3d 1078, 1100–02 (C.D. Cal. 2015); Connell v. Meritor Sav. Bank, No. CIV. A. 90-5916, 1991 WL 25715, at *2 (E.D. Pa. Feb. 27, 1991); see also Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273–74

3

(1995) (adopting a broad reading of the phrase "involving commerce" in 9 U.S.C. § 2). The FAA provides two mechanisms for enforcing an arbitration agreement: a stay of proceedings under § 3 when an issue in the case is "referable to arbitration" and an order compelling arbitration under § 4 when a party has refused to adhere to an arbitration agreement. 9 U.S.C. §§ 3, 4. Because both Giddings and Defendants have filed affidavits with attached exhibits, this Court will apply the summary judgment standard when ruling on the motion to compel arbitration, viewing the evidence and resolving genuine issues of material dispute in the nonmoving party's favor. Neb. Mach. Co. v. Cargotec Sols. LLC, 762 F.3d 737, 741–42 (8th Cir. 2014).

## III.    Analysis

### A. Delegation Provision and Waiver Thereof

Ordinarily, a court considering a motion to compel arbitration must decide two threshold issues, sometimes referred to as "questions of arbitrability:" 1) whether a valid arbitration agreement exists between the parties; and 2) whether the dispute falls within the scope of the arbitration agreement. Faber v. Menard, Inc., 367 F.3d 1048, 1052 (8th Cir. 2004); Daisy Mfg. Co. v. NCR Corp., 29 F.3d 389, 392 (8th Cir. 1994). Questions of arbitrability are for the court to decide "[u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (alteration in original) (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986)). However, just as parties can agree to arbitrate the merits of a dispute, they can also agree to submit questions of arbitrability to the arbitrator. Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 68–69 (2010). Thus, although there is a presumption that courts will decide questions of arbitrability, these questions must be sent to arbitration if the parties clearly and unmistakably expressed their intent to do so. Howsam, 537

U.S. 79 at 83–84; see also Rent-A-Center, 561 U.S. at 69 n.1. Agreements to arbitrate questions of arbitrability have come to be known as "delegation provisions." See Rent-A-Center, 561 U.S. at 68.

Both parties addressed questions of arbitrability to this Court in briefing and at oral argument. That is, neither party argued or even addressed a claimed delegation provision being in the arbitration clause. However, under Eighth Circuit precedent, this arbitration clause arguably could be read as containing a delegation provision intending to submit questions of arbitrability to the arbitrator. The arbitration clause provides that "[i]n the event any disagreement arises under this Agreement, the disagreement shall be settled by binding arbitration pursuant to the Rules of the American Arbitration Association ['AAA']." Doc. 21-1 at 6. The AAA Employment Arbitration Rules and Mediation Procedures, in turn, provide for the arbitrator to rule on questions of arbitrability. See AAA Employment Arbitration Rules and Mediation Procedures, Rule 6[2] ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."). When an arbitration provision incorporates rules that authorize an

---

[2]Rule 6 of the Employment Arbitration Rules and Mediation Procedures was in effect when Giddings signed the Employment Agreement in 2015. The arbitration clause specifies "Rules of the American Arbitration Association" generally and not the Employment Arbitration Rules and Mediation Procedures, but those are the AAA rules that obviously would govern employment disputes. In Mercadante v. XE Services, LLC, 78 F. Supp. 3d 131 (D.D.C. 2015), the arbitration provision simply stated that disputes under the contract "shall be resolved by binding arbitration according to the rules of the American Arbitration Association." Id. at 138. The district court cited to Rule 6 of the AAA Employment Arbitration Rules and Mediation Procedures without discussing whether the general reference to the AAA rules was sufficient to incorporate the AAA rules for employment disputes. Id. at 138. But see, Glob. Client Sols., LLC v. Ossello, 367 P.3d 361, 369 (Mont. 2016) (holding that an arbitration provision stating that arbitration would be "administered by the American Arbitration Association ('AAA') pursuant to its rules and procedures" did not show that the parties agreed to have the arbitrator decide issues of arbitrability in part because the arbitration provision did not specify which set of AAA rules were incorporated).

arbitrator to decide issues of arbitrability, the Eighth Circuit deems that incorporation to constitute "a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator." Fallo v. High-Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009); see also Green v. SuperShuttle Int'l, Inc., 653 F.3d 766, 769 (8th Cir. 2011) ("By incorporating the AAA Rules, the parties agreed to allow the arbitrator to determine threshold questions of arbitrability."). The arbitration clause in Fallo contained language similar to the arbitration clause here, stating that disputes "shall be settled by arbitration in accordance with the Commercial Rules of the American Arbitration Association." 559 F.3d at 877. The Eighth Circuit held that this general language was sufficient to incorporate the Commercial Rules of the AAA, including Rule 7, which gives arbitrators the authority to determine their own jurisdiction. Id. at 877–78. Because Rule 7 authorizes arbitrators to decide issues of arbitrability, the Eighth Circuit held that the arbitration provision's incorporation of the AAA rules was "a clear and unmistakable expression of the parties' intent to leave issues of arbitrability to an arbitrator."[3] Id. at 878.

Despite what the Fallo case deems a delegation provision in the arbitration clause, Media Lodge's motion to compel arbitration relied on the arbitration clause in general, and Media Lodge at no time has argued the existence of a delegation provision requiring the arbitrator to decide questions of arbitrability. So the question becomes whether Media Lodge has waived any

---

[3]Because Media Lodge failed to argue that the arbitration clause contained a delegation provision, Giddings did not have a chance to argue, as Giddings surely would, that he was unsophisticated and had utterly no intention to leave issues of arbitrability to the arbitrator and was unaware of the content of AAA rules. Such an argument likely would not produce a different result than in Fallo. Indeed, the plaintiffs in Fallo were a group of 38 current or former students of a for-profit vocational school that had allegedly engaged in fraudulent misrepresentation contrary to a Missouri consumer protection statute, but the Eighth Circuit nevertheless deemed the reference in their student enrollment agreements to AAA rules to constitute a "clear and unmistakable expression" of intent to leave issues of arbitrability to the arbitrator. Fallo, 559 F.3d at 878.

assertion of a delegation provision in the arbitration clause. After all, "[a] delegation clause operates as a defense that the defendant must raise in order to rely upon it." <u>Bodine v. Cook's Pest Control, Inc.</u>, 830 F.3d 1320, 1324 (11th Cir. 2016). Under Eighth Circuit precedent, a party can waive an assertion of a delegation provision by failing to raise the argument. <u>Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.</u>, 516 F.3d 695 (8th Cir. 2008). The Eighth Circuit in <u>Express Scripts</u> found a waiver of the argument of a delegation provision to exist because the defendant not only failed to raise the issue before the district court, but also forwent briefing the issue to the Eighth Circuit, raising it for the first time at oral argument. <u>Id.</u> at 701–02. Because <u>Express Scripts</u> involved a more obvious case of waiver, this Court—after considering briefing of the motion and oral argument on the motion—entered an Order Concerning Possible Waiver of "Delegation Provision" Assertion, Doc. 63, which noted the absence of any argument by the Defendants of a delegation provision in the arbitration clause. The Order stated that "it would benefit the Court to know for sure whether the defendants who filed the motion [to compel arbitration] are indeed waiving any arguments of a delegation provision," and gave those defendants an opportunity "to file any assertion of a 'delegation provision' and explanation of why such assertion has not been waived, or this Court will deem any such assertion to be waived." Doc. 63. The Defendants' response to the Order was:

> On February 23, 2018, the Court requested clarification from Defendants Media Lodge, IA Tech, LLC, and Jeff Siegel ("Defendants") regarding whether they had waived an argument that the arbitration provision at issue contained a "delegation provision." Defendants provide the following in response to the Court's request:
>
> Defendants did not raise or waive an argument or make an assertion that the issue of arbitrability should be within the arbitrator's jurisdiction. Such an argument would be unsupported because the arbitration provision in this case does not contain a delegation provision. Accordingly, Defendants acknowledge that the issue of arbitrability is properly before this Court.

Doc. 64.  Consistent with this Court's Order Concerning Possible Waiver of "Delegation Provision" Assertion, Doc. 63, and Express Scripts, the Defendants have waived any argument of the existence of a delegation provision, and this Court will address the questions raised about arbitrability.[4]

## B.    Issues of Arbitrability

Giddings argues that the arbitration clause is unconscionable, that his claims do not fall within the scope of the arbitration clause, and that USERRA claims are not arbitrable.  Giddings thus argues both that the arbitration clause is invalid and that, alternatively, the arbitration clause does not encompass his claims.

State contract law governs whether a valid arbitration agreement exists between Giddings and Media Lodge.  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  This Court is sitting in diversity jurisdiction, so it applies South Dakota's choice-of-law rules to determine

---

[4]Even if this Court had deemed there to be an enforceable delegation provision, this Court likely would have addressed at least some of Giddings' challenges to arbitrability.  When an arbitration clause contains a delegation provision, the party opposing arbitration can still challenge the validity of the delegation provision itself.  Rent-A-Center, 561 U.S. at 68–72; Brennan v. Opus Bank, 796 F.3d 1125, 1133–34 (9th Cir. 2015); see also, Fallo, 559 F.3d at 877–79 (considering arguments that arbitration clause was unconscionable after deciding that parties had delegated questions of arbitrability to the arbitrator).  Case law from the Supreme Court and the Ninth Circuit suggests that Giddings would ordinarily need to direct his unconscionability arguments to the delegation provision itself rather than the arbitration clause as a whole.  Rent-A-Center, 561 U.S. at 70–74 (refusing to consider arguments that an arbitration contract was unconscionable as a whole where the specific arbitration agreement at issue was a delegation provision in the contract giving the arbitrator authority to resolve questions of arbitrability); Brennan, 796 F.3d at 1128, 1132–34 (considering an arbitration clause and delegation provision similar to the ones here and holding that challenges to the arbitration clause, rather than to the delegation provision contained therein, were for the arbitrator to decide).  However, Media Lodge's motion to compel arbitration relied on the arbitration clause in general, and did not argue that the delegation provision required the arbitrator to decide questions of arbitrability.  Because that distinguishes this case from Rent-A-Center and Brennan where the parties seeking to compel arbitration specifically relied on delegation provisions, this Court likely would have construed Giddings' unconscionability arguments as challenges to the delegation provision and addressed at least some of them.

which state's laws govern whether a valid arbitration agreement exists. Erickson v. Thrivent Ins. Agency, Inc., 231 F. Supp. 3d 324, 329 (D.S.D. 2017). The Employment Agreement has a choice-of-law provision, stating that the Agreement "shall be construed and the legal relationship between the parties determined in accordance with the laws of the State of Georgia." Doc. 21-1 at 6. Giddings argues that the choice-of-law provision does not apply once the Employment Agreement is terminated, that South Dakota law should govern this case, and that, in any event, Georgia's law on contracts is substantially similar to South Dakota's. Doc. 23 at 9 n.3. Rather than addressing Giddings' argument about the choice-of-law provision, Defendants in their reply brief state that "[f]or purposes of this Motion to Dismiss and Compel Arbitration, Defendants do not object to the application of South Dakota and Eighth Circuit law." Doc. 28 at 3 n.2. This Court will therefore apply South Dakota law to determine whether Giddings and Defendants have a valid arbitration agreement.[5]

Unconscionability under South Dakota law has both "procedural" and "substantive" components. Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 194–95 (S.D. 2007); Johnson v. John Deere Co., 306 N.W.2d 231, 237 (S.D. 1981). Procedural unconscionability concerns the making of the contract. Nygaard, 731 N.W.2d at 194–95; Johnson, 306 N.W.2d at 237. Factors relevant to assessing procedural unconscionability include the relative bargaining power of the parties, whether the complaining party had a meaningful choice, and whether the provision in question was written in fine print or technical jargon. Nygaard, 731 N.W.2d at 194–95; Johnson, 306 N.W.2d at 237; Scotland Vet Supply v. ABA Recovery Serv., Inc., 583 N.W.2d 834, 837 (1996); Green v. Clinic Masters, Inc., 272 N.W.2d

---

[5]Georgia's law on unconscionability is similar enough to South Dakota's that the results in this case would be the same under either state's law. See Cappuccitti v. DirecTV, Inc., 623 F.3d 1118, 1124 (11th Cir. 2010) (describing Georgia law concerning unconscionability).

813, 816 (S.D. 1978). Substantive unconscionability, on the other hand, focuses on whether the contract contains "overly harsh or one-sided terms." Nygaard, 731 N.W.2d at 195 (quoting Johnson, 306 N.W.2d at 237).

Giddings argues that the arbitration clause is procedurally unconscionable because of a great disparity in bargaining power and because he had only one day to review the Employment Agreement. The argument that unequal bargaining power renders arbitration agreements unenforceable in employment relationships is not new. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 32–33 (1991). The Supreme Court addressed such an argument in Gilmer, holding that "[m]ere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." Id. at 33. Relying on Gilmer, this Court enforced an arbitration agreement between a software engineer and his employer even though the employer possessed greater bargaining power and the engineer had to sign the agreement to keep his job. Baker v. Science Applications Int'l Corp., No. Civ. 06-4096, 2006 WL 2708546, at *2–3 (D.S.D. Sept. 21, 2006), aff'd, 273 F. App'x 577 (8th Cir. 2008) (per curiam). Although the engineer argued that he had no choice but to work for his employer, this Court found that the engineer could have declined the arbitration agreement and sought work elsewhere. Id. at *2.

Giddings acknowledges the Baker decision but points to the Supreme Court's statement in Gilmer that "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." Gilmer, 500 U.S. at 33 (internal marks omitted) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627 (1985)). According to Giddings, the following facts show that the agreement to arbitrate resulted from

10

overwhelming economic power: 1) Media Lodge's employment of Giddings and Shelley was a material term of the merger between Media Lodge and GunUp, Doc. 25-5 at 22–23; Doc. 44-1 at 4; Doc. 25-2 at 3; Doc. 25-1 at 5;  2) Giddings received the Employment Agreement containing the arbitration clause one day before closing of the merger, Doc. 24 at ¶ 8; and 3) as a result of the merger, Giddings would receive $46,952.66 in deferred compensation for work he performed for GunUp, $85,702.00 in Media Lodge stock due to his 2.86% ownership in GunUp, and $16,654.27 in cash disbursements, Doc. 24 at ¶ 7; Doc. 25-5 at 61.  Giddings argues that his refusal to sign the Employment Agreement would have jeopardized his and Shelley's jobs and forfeited the deferred compensation, Media Lodge stock, and cash disbursements.

Media Lodge disputes many of the assertions Giddings relies on to show procedural unconscionability.  Media Lodge argues that the merger was not conditioned on Giddings' employment with Media Lodge so he did not have to sign the Employment Agreement to receive the deferred compensation, stock, and disbursements; that there is no evidence Shelley's job would have been in jeopardy if Giddings had refused to sign the Employment Agreement; and that Giddings was given nearly two weeks to have the Employment Agreement reviewed by counsel.  In support of this last argument, Media Lodge filed an affidavit from Siegel explaining that Hall was acting on behalf of Giddings and Shelley to negotiate their employment agreements, so Siegel provided all of the terms and conditions to Hall and discussed the terms of those agreements with Hall.  Doc. 29 at ¶ 4.  Media Lodge also filed a series of emails between Siegel and Hall concerning the employment agreements in support of its argument.  On February 11, 2015, Siegel emailed Hall a to-do list, which included a promise to send Hall employment agreements for Giddings and Shelley.  Doc. 29-2 at 1.  Siegel asked Hall how Giddings and Shelley's "comp packages" were structured and told Hall that their salaries would be "as outlined

in your spreadsheet." Doc. 29-2 at 1. Hall responded that Siegel's email "sound[ed] good" and that he would be working on the to-do list from his end. Doc. 29-2. On March 17, 2015, Siegel emailed Hall a draft employment agreement for Hall, Giddings, and Shelley. Doc. 29 at ¶ 7; Doc. 29-3. Although the draft left blank spaces for the employee's name, title, and compensation, it contained the other terms of the agreement, including the same arbitration provision found in the employment agreements Giddings and Hall ultimately signed. Doc. 29 at ¶ 7; Doc. 21-1 at 6; Doc. 29-3 at 6. Hall replied that the draft looked like "pretty boiler plate 'at-will' employment agreements." Doc. 29-3 at 1. Because the parties were considering having Hall and the Giddings work a set term of years rather than an indefinite period as the draft provided, Hall offered to draft some revised employment contracts. Doc. 29-3 at 1. He explained that he had "a fair bit of experience in this area (running HR and recruiting for a $50MM company for close to 2 years and my wife is an employment attorney who specializes in such things)." Doc. 29-3 at 1. On March 18, 2015, Siegel emailed Hall a copy of Media Lodge's military leave policy along with the following message: "Good to chat yesterday. Re: Caleb [Giddings]—what's been the GunUp policy on Military Leave? Our company policy is as written below, but I'm open to pushing to change that if needed." Doc. 29-4 at 1. Hall replied that same day saying "[p]retty standard policy language for military duty. Should be fine for us." Doc. 29-4 at 1. On March 19, 2015, Hall emailed Media Lodge's counsel saying that attorney Jamie Cole would be handling "our employment agreements" and that Hall and Cole would be drafting agreements with a three-year term of employment. Doc. 29 at ¶ 9; Doc. 29-5 at 2. After further discussions, however, Hall emailed Siegel that "[w]e are ok with at-will agreements." Doc. 29-5 at 1. He said that he would contact Siegel if he had any questions about the agreements and that he would have Attorney Cole review them if he needed advice. Doc. 29-5 at

1. On March 26, 2015, Siegel emailed Hall a revised copy of Hall's employment agreement. Doc. 29 at ¶ 10; Doc. 29-6. He also asked Hall to confirm the job titles and compensation for Giddings and Shelley. Docs. 29-6, 29-7. Hall responded that same day, stating that he had talked with Giddings and Shelley and that they were fine with their titles and compensation. Doc. 29-7.

The emails between Hall and Siegel undercut Giddings's claim that the arbitration clause was procedurally unconscionable because he had so little time to review it. Although Giddings may not have received the final Employment Agreement until a day before the March 31 merger, Hall (the CEO and co-owner of the small business at which Giddings then worked) had a draft of the agreement, which included the arbitration clause, by March 17. Hall said that he had experience with employment agreements and, by March 19, he had an attorney to review the agreements if he felt it was necessary. It was not unreasonable for Siegel to use Hall, GunUp's CEO, to communicate with then GunUp employees Giddings and Shelley about the post-merger employment agreements with Media Lodge. And Siegel can hardly be faulted for assuming that Hall was acting on Giddings' behalf in negotiating the employment agreement. After all, Hall provided Siegel with salary information for Giddings and Shelley, discussed Medial Lodge's military leave policy as it related to Giddings, said that the leave policy would be "fine for us" and that "[w]e are okay with at-will agreements," and told Siegel that he had spoken with Giddings and Shelley to confirm they were satisfied with their salaries. Giddings has not provided any evidence that he requested more time to consider the Employment Agreement, that he was denied the opportunity to negotiate the terms of the Employment Agreement himself, or that he raised any concerns about the Employment Agreement with Hall or Media Lodge. Nor has he alleged that he did not understand the arbitration clause, which was written in plain

English with normal-size print. Under these circumstances, Giddings's receipt of the final Employment Agreement one day before the merger does not make the arbitration clause procedurally unconscionable.

Giddings's argument that Media Lodge's overwhelming bargaining power makes the arbitration clause procedurally unconscionable fares no better. None of the documents Giddings cites establish that the merger, the money Giddings hoped to receive therefrom, and Shelley's job were dependent upon him signing the Employment Agreement. See Doc. 25-5; Doc. 44-1 at 4; Doc. 25-2 at 3; Doc. 25-1 at 5. Even if the money from the merger had somehow been dependent on Giddings signing the Employment Agreement, the choice Giddings faced was no different from the choice facing every employee asked to sign an arbitration agreement— whether the job and the salary and benefits that come with it are worth more to the employee than access to a judicial forum. But the Supreme Court's statement in Gilmer—that unequal bargaining power is not alone an adequate reason for refusing to enforce arbitration clauses in employment contracts—signals that employees seeking to avoid an arbitration clause must show "circumstances more egregious than the ordinary economic pressure faced by every employee who needs the job." Vilches v. The Travelers Co., 413 F. App'x 487, 493 (3d Cir. 2011) (citation omitted). Indeed, "[i]t is well-settled . . . that conditioning employment on the acceptance of an agreement to arbitrate disputes . . . is not itself unlawfully coercive." Williams v. Parkell Prods., Inc., 91 F. App'x 707, 708 (2d Cir. 2003). Giddings has not offered any evidence of financial distress so bad that he had no choice but to sign the Employment Agreement. And there is no indication that Giddings could only work for Media Lodge. In fact, Giddings explains in his affidavit that he is the owner and author of a blog for competitive shooters and that he has 11 years' experience and "deep relationships" in the firearm media

14

industry. Doc. 24 at ¶¶ 3, 4. Giddings had the option to decline employment with Media Lodge. Although this may not have been an easy choice, it was still a meaningful one.

Giddings also argues that the arbitration clause is substantively unconscionable because it limits the arbitrator to awarding "actual damages." Doc. 21-1 at 6. In Giddings' view, this limitation is one-sided because the party most likely to seek additional damages, such as liquidated damages or attorney fees under a statutory claim, would disproportionately be the employee. Questions about remedies are generally for the arbitrator to decide in the first instance. Faber v. Menard, Inc., 367 F.3d 1048, 1054 (8th Cir. 2004). The arbitrator is not only "particularly well-suited to interpret the agreement and determine the appropriate extent of [its] remedial authority," but also "has the authority to enforce substantive statutory rights even if those rights are in conflict with contractual limitations in the agreement that would otherwise apply." Id. (alteration in original) (citations and internal marks omitted). Recognizing that arbitrators have the authority to enforce substantive statutory rights even if the contract says otherwise, Media Lodge said during the hearing that if Giddings' claims go to arbitration, Media Lodge would not argue that the Employment Agreement deprived the arbitrator of authority under USERRA to award front pay, liquidated damages, or costs and fees.[6] The Eighth Circuit in Faber recognized that "a restriction on remedies in an arbitration agreement may so limit recovery that the agreement is unconscionable and invalid under state law." Id. at 1054–55 (considering argument that arbitration provision requiring employee to pay his own attorney's fees unconscionably denied the employee his statutory right to fees and costs if he prevailed under the Age Discrimination Employment Act). But here, the judicial admissions of Media

---

[6]Media Lodge also agreed that it would not argue that the final sentence of the arbitration clause limits Giddings' defenses to the arbitrator's decision.

Lodge committing itself not to argue for any restriction on the arbitrator to award damages recoverable under USERRA resolves that concern about substantive unconscionability. Moreover, this Court is staying the case, rather than dismissing it, in case the arbitrator somehow decides that USERRA claims or remedies cannot be addressed under the arbitration clause.

Giddings nevertheless argues that the limitation on damages makes the arbitration clause substantively unconscionable under the Supreme Court of South Dakota's decision in Rozeboom v. Northwestern Bell Telephone Co., 358 N.W.2d 241 (S.D. 1984).[7] The plaintiff in Rozeboom signed a contract with Northwestern Bell to advertise his business in the yellow pages. Id. at 242. The contract contained a clause limiting the plaintiff's damages to the price of the advertisement. Id. The Supreme Court of South Dakota found that this limitation was unconscionable because of Northwestern Bell's monopoly on yellow pages advertising and its "wholly unequal" bargaining power. Id. at 245. The compelling reasons for finding the limitation clause in Rozeboom unconscionable are not present here. Media Lodge did not have a monopoly on jobs involving marketing in the firearm industry and Giddings could have sought work elsewhere if he did not want to sign the Employment Agreement. And, again, Media Lodge has made a judicial admission that it will not seek to enforce the damage limitation language.

Giddings' last argument about substantive unconscionability is that the arbitration clause is unenforceable because it requires that arbitration occur in Atlanta, Georgia. Giddings

---

[7]Giddings asserts in a footnote that a Washington state court hearing, a case Hall brought against Media Lodge, declared the Arbitration Provision at issue here "both procedurally and substantively unconscionable." Doc. 23 at n.4. But Hall's motion for partial summary judgment in that case was unopposed, and the state court merely declared the provision unenforceable without engaging in any analysis. Doc. 25-4 at 2–3. Giddings also argues that this Court in Baker "specifically disapproved of arbitration clauses containing limitations of plaintiff remedies as unconscionable." Doc. 23 at 12. This Court never made any such statement in Baker.

contends that he has no connection to Georgia and that it would be unconscionable to require him to travel to Georgia at his own expense to pursue his rights against Media Lodge. Media Lodge had little explanation of why Georgia was selected as a venue for arbitration, but said at the hearing that it would "not necessarily" be insisting that the arbitration occur in Georgia. Giddings has not cited any authority in support of his argument or offered any evidence that traveling from Florida (where he presently resides) to Georgia for the arbitration would be prohibitively expensive for him. See Green Tree Fin. Corp.–Al. v. Randolph, 531 U.S. 79, 92 (2000) ("[W]here . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."). This Court declines to find the arbitration clause unconscionable under these circumstances.

### C. Scope of Arbitration Agreement

Giddings argues that he cannot be forced to arbitrate his USERRA claims because they do not fall within the scope of the arbitration clause. While state law governs whether a valid arbitration agreement exists, federal substantive law governs whether a claim falls within the scope of an arbitration clause. Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 731 (8th Cir. 2009). "[A]rbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (quoting Rent-A-Center, 561 U.S. at 69). Therefore, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam, 537 U.S. at 83 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)) However, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including "construction of the contract language itself." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).

Giddings' argument that his USERRA claims are not within the scope of the arbitration clause focuses somewhat curiously not on the arbitration clause but on Section 5 of the Employment Agreement, which is entitled "Termination of Employment Under Agreement." Doc. 21-1 at 2. Among other things, Section 5 states that Media Lodge can terminate Giddings' employment "without any liability at any time" and that Media Lodge's total liability for terminating Giddings "shall be payment of his salary through the effective date of termination." Doc. 21-1 at 3. Giddings contends that Section 5 constitutes an illegal prospective waiver of his USERRA rights, citing <u>Richardson v. Sugg</u>, 448 F.3d 1046, 1054–55 (8th Cir. 2006). Giddings appears to argue that the existence of such unenforceable prospective waiver language in Section 5 indicates that arbitration under the Employment Agreement was not meant to cover USERRA claims. Part of Giddings' argument is undercut by Media Lodge's judicial admission that it will not invoke damage limitation provisions in the Employment Agreement if the USERRA claims are subject to arbitration. Regardless, evaluating whether the dispute is within the scope of the arbitration clause should start with the language of the arbitration clause itself.

The arbitration clause in the Employment Agreement applies "in the event any disagreement arises under this Agreement." Doc. 21-1 at 6. The Eighth Circuit has classified the phrase "all disputes arising under" in an arbitration clause as broad, although not as broad as "any claim, controversy or dispute . . . relating to." <u>PRM Energy Sys., Inc. v. Primenergy, L.L.C.</u>, 592 F.3d 830, 837 (8th Cir. 2010); <u>see also</u> <u>Coregis Ins. Co. v. Am. Health Found., Inc.</u>, 241 F.3d 123, 128–29 (2d Cir. 2001) (describing "related to" as broader than "arising out of" in contract language). "Arbitration may be compelled under 'a broad arbitration clause . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision.'" <u>PRM Energy Sys.</u>, 592 F.3d at 837 (internal marks omitted) (quoting <u>3M Co. v. Amtex Sec.,</u>

18

Inc., 542 F.3d 1193, 1199 (8th Cir. 2008)). At least three courts have concluded that statutory claims fall within arbitration clauses similar to the clause here. Dreher v. Eskco, Inc. Nos. 3:08-cv-325, 3:09-cv-209, 2009 WL 2176060, at *2, 6–7 (S.D. Ohio July 21, 2009) (holding that employee's claims under the FMLA and state gender discrimination statutes fell within arbitration clause requiring the employee to arbitrate "[a]ny dispute arising from" the employment agreement); Kruse v. AFLAC Int'l, Inc., 458 F. Supp. 2d 375, 387 (E.D. Ky. 2006) (holding that arbitration clause requiring arbitration of "any dispute arising under this Agreement to the maximum extent allowed by applicable law" in an employment agreement applied to employee's Title VII and state statutory claims); Owner-Operator Indep. Driver's Ass'n, Inc. v. Swift Transp. Co., 288 F. Supp. 2d 1033, 1036–37 (D. Ariz. 2003) (holding that federal statutory claims fell within the scope of an arbitration clause requiring the parties to arbitrate "[a]ny disagreement or litigation arising under" the contract) (alteration in original).

This case presents a close decision on whether Giddings' USERRA claims are within the scope of the arbitration clause. Giddings' complaint alleges only USERRA claims and makes no breach of Employment Agreement or other such non-USERRA claims. The Employment Agreement's damage limitations in Section 5 and in the arbitration clause itself—though such damage limitations are being waived by Media Lodge—suggest that the parties did not have in mind potential federal statutory claims like USERRA when drafting or negotiating the arbitration clause or Employment Agreement.[8] The decision would be easier if the arbitration clause had

---

[8]The language of the arbitration clause is not ambiguous and thus extrinsic evidence to interpret it typically would not be employed. On the issue of unconscionability of the arbitration clause, and not on interpretation, the parties submitted information of record that GunUp's CEO inquired of Media Lodge's CEO about military leave policy during the time Giddings' employment agreement was negotiated, and Media Lodge supplied that policy which GunUp's CEO deemed satisfactory. This would suggest that the parties were aware of the possibility of Giddings going on military leave.

made all disputes "relating to" Giddings' employment subject to arbitration, but this arbitration clause applies "in the event that any disagreement arises under this [Employment] Agreement." The Employment Agreement established the employer-employee relationship between Media Lodge and Giddings. Although Giddings' claims are based only on USERRA, they arise out of the employment relationship and termination of that relationship, and Media Lodge's defense on the merits to the claims will focus on what it believes were Giddings' lack of commitment to Media Lodge.[9] The Eighth Circuit has held arbitration appropriate to compel under 'a broad arbitration clause . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision.'" PRM Energy Sys., 592 F.3d at 837 (internal marks omitted) (quoting 3M Co., 542 F.3d at 1199). Giddings' USERRA claims here "touch matters covered by" the arbitration provision, so arbitration should be compelled under Eighth Circuit precedent.

### D. Arbitrability of USERRA Claims

At the hearing, Giddings argued for the first time that 38 U.S.C. § 4302, the legislative history of USERRA, and the Department of Labor's (DOL) interpretation of § 4302 establish that Congress intended to prohibit compelled arbitration of USERRA rights. At the invitation of this Court, both parties submitted letters after the hearing citing cases addressing the arbitration of USERRA claims. Docs. 58, 59.

"[C]ontracts to arbitrate federal statutory claims are enforceable unless 'Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" Bailey v. Ameriquest Mortg. Co., 346 F.3d 821, 822–23 (8th Cir. 2003) (quoting Green Tree Fin.

---

[9]The parties filed pleadings both in a lawsuit that Media Lodge and related plaintiffs filed against GunUp alleging fraud and breach of the merger agreement and in a lawsuit GunUp's CEO Hall filed against Media Lodge and related parties. Those pleadings included in places allegations about Media Lodge's alleged inappropriate treatment of Giddings' employment and about Giddings' alleged underperformance of his duties as a Media Lodge employee.

Corp., 531 U.S. at 90). Such congressional intent "will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." Gilmer, 500 U.S. at 26.

Every federal circuit court to consider the issue has held that neither § 4302 nor the legislative history of USERRA shows that Congress intended to prohibit compelled arbitration of USERRA claims. Ziober v. BLB Res., Inc., 839 F.3d 814, 817–821 (9th Cir. 2016), cert. denied, 137 S. Ct. 2274 (2017); Landis v. Pinnacle Eye Care, LLC, 537 F.3d 559, 561–63 (6th Cir. 2008); Garrett v. Circuit City Stores, Inc., 449 F.3d 672, 676–81 (5th Cir. 2006); see also Bodine v. Cook's Pest Control Inc., 830 F.3d 1320, 1327 (11th Cir. 2016) (holding that § 4302(b) does not "automatically invalidate an entire agreement with USERRA-offending terms"). For the reasons set forth by the Fifth, Sixth, and Ninth Circuits, this Court finds that § 4302 and USERRA's legislative history do not establish that Congress intended to preclude a waiver of judicial remedies for USERRA rights.

No federal circuit court has specifically addressed the DOL's interpretation of § 4302(b), although the issue was raised before the Ninth Circuit in Ziober. See Ziober, 839 F.3d at 822 (Watford, J., concurring) (citing the DOL's interpretation of § 4302(b)); Plaintiff-Appellant's Reply Brief at 33–36, Ziober, 839 F.3d 814 (No. 14-56374), 2015 WL 1396699, at *27–28 (urging the Ninth Circuit to give deference to the DOL's interpretation of § 4302(b)). In the preamble to the federal regulations on USERRA, the DOL, the agency tasked with administering USERRA, stated that § 4302(b) "has been interpreted expansively; for instance, it includes a prohibition against the waiver in an arbitration agreement of an employee's right to bring a USERRA suit in Federal court. See, e.g., Garrett v. Circuit City Stores, Inc., 338 F. Supp. 2d 717, 721–22 (N.D. Tex. 2004)." 70 Fed. Reg. 75246, 75257 (Dec. 19, 2005). The DOL did not

make this statement when discussing arbitrability of USERRA claims, but as an example of the breadth of the statute when explaining why employees cannot waive their reemployment rights before or during a term of military service. Id. There has been a significant shift in the law since the DOL issued the preamble in 2005. Not only has the Fifth Circuit reversed the district court decision the DOL relied on when discussing § 4302(b), see Garrett, 449 F.3d 672, but the Ninth and Sixth Circuits, along with several district courts, have held that § 4302(b) does not prohibit compelled arbitration of USERRA claims, Ziober, 839 F.3d at 817–821; Landis, 537 F.3d at 561–63; Will v. Parsons Evergreene, LLC, No. 08-cv-00898-DME-CBS, 2008 WL 5330681, at *3–5 (D. Colo. Dec. 19, 2008); Ohlfs v. Charles Schwab & Co., No. 08-cv-00710-LTB-MEH, 2008 WL 4426012, at *3–4 (D. Colo. Sept. 25, 2008); Kitts v. Menards, Inc., 519 F. Supp. 2d 837, 844 (N.D. Ind. 2007). Giddings has not cited any cases holding that the DOL's 2005 interpretation of § 4302(b) establishes that employees cannot be compelled to arbitrate their USERRA claims. Moreover, it is unclear what weight this Court should give an agency's interpretation when attempting to discern whether Congress intended to prohibit arbitration of statutory rights. See Krusch v. TAMKO Bldg. Prods., Inc., 34 F. Supp. 3d 584, 591–94 (M.D.N.C. 2014) (finding that agency's interpretation of statute was not controlling when deciding whether Congress intended to prohibit "pre-dispute" arbitration of statutory claims). Giddings' citation to the DOL's interpretation does not establish that Congress intended to preclude a waiver of judicial remedies for USERRA rights. Will, 2008 WL 5330681, at *5 (holding that even if the DOL's interpretation of § 4302(b) could be "some indication of Congress's intent, it is at best very minimal indication of that intent, and insufficient to overcome the strong federal policy favoring arbitration"); Ohlfs, 2008 WL 4426012, at *4 (rejecting

argument that the DOL's interpretation of § 4302(b) established that USERRA claims are not subject to arbitration).[10]

### E. Arbitration of Claims against Siegel and IA Tech

The parties did not brief whether this Court can or must compel arbitration of Giddings' claims against Siegel and IA Tech (who are affiliated with Media Lodge but not signatories to the Employment Agreement). This Court raised the issue at the hearing, and Defendants cited to authority addressing the issue in their letter to this Court. Doc. 58 (citing Alltel Commc'ns, LLC v. Oglala Sioux Tribe, No. CIV. 10-5011-JLV, 2010 WL 1999315 (D.S.D. May 18, 2010)). In 2009, the Supreme Court made clear that state contract law controls whether a nonsignatory can enforce an arbitration clause. Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009); Donaldson Co., 581 F.3d at 732 (applying Mississippi law to determine whether a nonsignatory could enforce an arbitration provision). By that time, however, federal courts had already developed a significant body of federal common law concerning a nonsignatory's ability to compel arbitration. See, e.g., CD Partners, LLC v. Grizzle, 424 F.3d 795, 798 (8th Cir. 2005) (discussing when a nonsignatory can enforce an arbitration clause without referencing any particular state's law); PRM Energy Sys., 592 F.3d at 834 (relying on "federal law" to decide

---

[10]Giddings' letter to this Court also cited to Quiles v. Union Pacific Railroad Co., 8:16CV330, 2017 WL 1592360 (D. Neb. Apr. 28, 2017), to question "the enforceability of arbitration agreements when the arbitration agreement itself is silent on USERRA." Doc. 59. After deciding that there was no valid, binding agreement to arbitrate, the district court in Quiles suggested that the arbitration agreement was also unenforceable because it failed to mention USERRA and USERRA requires that employees expressly waive their right to bring USERRA claims in federal court. Quiles, 2017 WL 1592360, at *6. The court in Quiles was incorrect; the law does not require that arbitration agreements specifically mention USERRA to be enforceable. Ziober, 839 F.3d 814 (compelling arbitration of USERRA claims where the arbitration agreement was silent on USERRA); Landis, 537 F.3d 559 (same); Garrett, 449 F.3d 672 (same); Mitchell v. Weather Channel, LLC, No. 1:11-CV-3039-ODE, 2012 WL 13013002, at *4–5 (N.D. Ga. Mar. 9, 2012) (rejecting argument that plaintiff could not be compelled to arbitrate USERRA claims because arbitration clause failed to expressly mention USERRA).

whether a nonsignatory could compel arbitration). The lone South Dakota case on this issue—
Rossi Fine Jewelers, Inc. v. Gunderson, 648 N.W.2d 812 (S.D. 2002)—drew broadly from this
body of federal common law to hold that non-signatories could enforce an arbitration clause in a
franchise agreement. Id. at 815–16. The plaintiff in Rossi contracted with a company called
Nature's 10 to operate a jewelry franchise. Id. at 813. The plaintiff eventually sued Nature's 10,
Nature's 10's owner Mylan Ventures, and several individuals who were officers of Nature's 10
or Mylan. Id. Among other things, the plaintiff alleged breach of contract, fraud, deceit, and
personal liability of the officers. Id. at 814. Although Mylan Ventures and the officers were not
signatories to the franchise agreement between the plaintiff and Nature's 10, they moved to
compel arbitration under the arbitration clause contained therein. Relying on agency principles,
principles of equitable estoppel, and the idea that plaintiffs should not be able to avoid arbitration
simply by adding a nonsignatory defendant, the Supreme Court of South Dakota held that Mylan
Ventures and the officers could enforce the arbitration clause. Id. at 815–16.

Applying Rossi here, this Court finds that Siegel and IA Tech can enforce the arbitration
clause. Like Mylan Ventures and the officers in Rossi, Siegel and IA Tech are closely related to
one of the signatories to the arbitration clause. One of the reasons the Supreme Court of South
Dakota allowed the officers in Rossi to enforce the arbitration clause was that the officers were
agents of Mylan or Nature's 10 and were being sued for actions they took as officers of the
companies. Id. at 815. The court explained that allowing agents to enforce an arbitration
agreement under such circumstances was necessary "to prevent circumvention of arbitration
agreements" and "to effectuate the intent of the signatory parties." Id. (quoting Hirschfeld
Prods., Inc. v. Mirvish, 673 N.E.2d 1232, 1233 (N.Y. 1996)). The Eighth Circuit recognizes a
similar rule. Relying on "agency and related principles," the Eighth Circuit has held that a

nonsignatory should be allowed to "compel arbitration when, as a result of the nonsignatory's close relationship with the signatory, a failure to do so would eviscerate the arbitration agreement." PRM Energy Sys., 592 F.3d at 834. Here, Siegel is Media Lodge's CEO and, according to Giddings' complaint, its agent. Doc. 41 at ¶ 11. Giddings' allegations against Siegel all concern Siegel's conduct as an officer of Media Lodge. As to IA Tech, Giddings' complaint states that IA Tech is the majority owner of Media Lodge, that IA Tech was "jointly operating Media Lodge in Sioux Falls," and that Media Lodge's press releases state that "Media Lodge is a division of IA Tech." Doc. 41 at ¶¶ 5–6, 12. Siegel and IA Tech's relationship with Media Lodge is close enough that the failure to allow them to compel arbitration would eviscerate Media Lodge's arbitration agreement with Giddings. Rossi, 648 N.W.2d at 815–16; see also Finnie v. H & R Block Fin. Advisors, Inc., 307 F. App'x 19, 21 (8th Cir. 2009) (unpublished per curiam) (applying the close relationship test to hold that a supervisor sued for employment discrimination could enforce an arbitration agreement between employer and plaintiff); Grizzle, 424 F.3d at 798–99 (holding that the close relationship test allowed three corporate officers to compel arbitration under an arbitration agreement to which their corporation was a signatory); Pritzker v. Merrill Lynch, 7 F.3d 1110, 1121 (3d Cir. 1993) (holding that a nonsignatory corporate sister of a signatory corporation could compel arbitration); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320–21 (4th Cir. 1988) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement."). After all, Giddings alleges that Media Lodge and IA Tech were jointly operating the Sioux Falls Media Lodge office and that they both qualify as "private employers" under USERRA. Doc. 41 at ¶¶ 5, 13. And Giddings

does not distinguish between defendants in terms of the claims asserted or the misconduct alleged. Rather, he alleges the same USERRA claims against the Media Lodge Defendants—failure to properly reemploy, demotion, and termination—using the same bases for liability: the failure to assign Giddings the strong sales accounts he would have had but for his military service, requiring him to accept a lower paying contract position with lesser benefits and responsibilities, and terminating his employment without just cause. Doc. 41 at ¶¶ 45, 53, 60–62, 71–72. Thus, under Rossi, Giddings' claims against Siegel and IA Tech are subject to arbitration alongside the claims against Media Lodge.

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that Defendants' Motion to Dismiss Proceedings and Compel Arbitration, Doc. 18, is granted to the extent that this case is stayed and the parties must proceed to arbitration in accordance with the terms of the contract.

DATED this 13th day of March, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE